IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

BANQUO D. YOUNG,

    Petitioner,                                        No. CIV S-03-1674 MCE CMK P

    vs.

JOE McGRATH, Warden, et al.,

    Respondents.             FINDINGS AND RECOMMENDATIONS

_____/

        Petitioner is a state prisoner proceeding pro se[1] with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his conviction of first-degree murder, assault with a deadly weapon, and shooting at an occupied motor vehicle and sentence of thirty-seven years, eight months to life in state prison. Petitioner claims that his constitutional rights were violated because there was insufficient evidence to support his conviction of first-degree murder, the trial court erroneously declined to give a jury instruction and the prosecutor committed prosecutorial misconduct in his closing argument.

I.    Background[2]

        Petitioner's crime is the result of a gang related shooting. During the afternoon of

---

[1] Petitioner had counsel until August 30, 2005, when the court granted petitioner's motion to substitute himself for Eric Weaver as counsel in this matter. (Doc. 34.) Petitioner had counsel when he filed his amended petition (doc. 13) and when he filed his traverse. (Doc. 23.)

[2] The unpublished decision of the California Court of Appeal, Third Appellate District contains a more detailed factual summary. (Answer, Ex D.)

November 19, 1994, four men drove in a Chevrolet Impala to a liquor store. (RT 213-214.) The driver, Paul Hignight and his friend, Ellis Garrett waited for the other two in the parking lot of the store; Hignight and Garrett were members of the Valley Hi Crips, a Sacramento street gang. (RT 211-214.) While Hignight and Garrett were waiting they had a clash with a car full of members of a rival gang. (RT 215, 217, 234.) Eventually the two groups drove off in separate directions. (RT 217.) Garrett fired several shots at the other car. (RT 217.) Hignight returned to the liquor store to pick up the two other passengers, then traveled to the home of one of the passengers, Jerome Byrant. (RT 217, 218, 226.) Hignight was not familiar with petitioner, and he had no idea whether petitioner was in the car full of rival gang members.

Later that same day, Hignight accepted five dollars to drive a group of six young men in to a skating rink. Hignight and Marion "Lucky" Johnson sat in the front bucket seats of the Impala. (RT 218-219.) Five of the six young men squeezed into the back seat and one of the young men was crammed into the front seats. (RT 218-219.) The Impala paused briefly on its way to the skating rink because Hignight and other occupants wished to chat with three female pedestrians at an intersection. (RT 219, 248, 252.) As the Impala completed its right turn at the intersection and started down the street, there were the sounds of gunfire. (RT 225-229.) The gunfire seemed to be coming from the passenger side, from the direction of an apartment complex. (RT 228.) Hignight did not notice any cars shooting at him, although he was alert for retaliation from the earlier incident at the liquor store. The female pedestrians did not see the defendant or anyone else on the street at the time of the shootings, nor did they notice any other cars. (RT 388.)

Lucky Johnson, who was sitting in the front bucket seat, shouted that he had been shot. (RT 115-116, 227-228.) The driver sped to a hospital. (RT 228.) When the occupants piled out of the car, they discovered the murder victim, thirteen-year-old Antoine Bryant, was unconscious with a bullet wound to his head. (RT 117-118.) The bullet had destroyed portions of his brain essential to life, and he eventually succumbed to his wound. (RT 664.)

II.     Standards for Granting Habeas Relief

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. See 28 U.S.C. § 2254(a). Federal habeas corpus relief also is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

See 28 U.S.C. § 2254(d) (referenced herein in as " § 2254(d)" or "AEDPA). See Ramirez v. Castro, 365 F.3d 755, 773-75 (9th Cir.2004)   (Ninth Circuit affirmed lower court's grant of habeas relief under 28 U.S.C. § 2254 after determining that petitioner was in custody in violation of his Eighth Amendment rights and that § 2254(d) does not preclude relief); see also Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003)  (Supreme Court found relief precluded under § 2254(d) and therefore did not address the merits of petitioner's Eighth Amendment claim).   Courts are not required to address the merits of a particular claim, but may simply deny a habeas application on the ground that relief is precluded by 28 U.S.C. § 2254(d). See Lockyer, 538 U.S. at 71 (overruling Van Tran v. Lindsey, 212 F.3d 1143, 1154-55 (9th Cir.2000) in which the Ninth Circuit required district courts to review state court decisions for error before determining whether relief is precluded by § 2254(d)).  It is the habeas petitioner's burden to show he is not precluded from obtaining relief by § 2254(d). See Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are different.  As the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially

> indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in <u>Williams v. Taylor</u>, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) that an unreasonable application is different from an incorrect one.

<u>Bell v. Cone</u>, 535 U.S. 685, 694 (2002). A state court does not apply a rule different from the law set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply fails to cite or fails to indicate an awareness of federal law. See <u>Early v. Packer</u>, 537 U.S. 3, 8 (2002).

The court will look to the last reasoned state court decision in determining whether the law applied to a particular claim by the state courts was contrary to the law set forth in the cases of the United States Supreme Court or whether an unreasonable application of such law has occurred. See <u>Avila v. Galaza</u>, 297 F.3d 911, 918 (9th Cir.2002), cert. dismissed, 538 U.S. 919 (2003). Where the state court fails to give any reasoning whatsoever in support of the denial of a claim arising under Constitutional or federal law, the Ninth Circuit has held that this court must perform an independent review of the record to ascertain whether the state court decision was objectively unreasonable. See <u>Himes v. Thompson</u>, 336 F.3d 848, 853 (9th Cir.2003). In other words, the court assumes the state court applied the correct law, and analyzes whether the decision of the state court was based on an objectively unreasonable application of that law. It is appropriate to look to lower federal court decisions to determine what law has been "clearly established" by the Supreme Court and the reasonableness of a particular application of that law. See <u>Duhaime v. Ducharme</u>, 200 F.3d 597, 598 (9th Cir.1999).

III.   Arguments and Analysis

    A.   <u>Insufficient Evidence</u>

Petitioner claims that there was insufficient evidence to support his conviction of first-degree murder. Petitioner argues that the evidence in this case is a "scenario in which a variety of people sought to resolve their own problems by making petitioner, a newcomer to the neighborhood, a scapegoat." (Amended Petition, 28:18-19.)

In order to prevail on a claim of insufficiency of the evidence, a petitioner must show that no rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt. See Jackson v.Virginia, 443 U.S. 307, 319 (1979); Windham v. Merkle, 163 F.3d 1092, 1101 (9th Cir. 1998). A reviewing court must consider the evidence as a whole and in a light most favorable to the prosecution. See Jackson, 443 U.S. at 319. If the record supports conflicting inferences, it must be presumed that the trier of fact resolved any conflicts in favor of the prosecution, and a reviewing court must defer to that resolution. See id.; Payne v. Borg, 982 F.2d 335, 338 (9th Cir. 1992). The standard in California state courts for reviewing sufficiency of evidence claims is the same as that set forth in Jackson; People v. Johnson, 26 Cal.3d 557, 578-579 (1980).

The last reasoned decision on this claim was the decision of the California Court of Appeal for the Third Appellate District on petitioner's direct appeal.[3] The Court of Appeal rejected this claim stating:

> To warrant the rejection of the statements given by a witness who has been believed...there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions. Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. Contradictions or inconsistencies in the testimony of a witness will not of themselves constitute inherent improbability. The Supreme Court even countenances extrajudicial identifications that a witness repudiates at trial.
> The defendant does not engage any of these principles. He does not even purport to satisfy the Mayberry standard for overturning credibility resolutions. He merely asserts his own view of the evidence. We thus reject this argument.

(Answer, Ex. D, People v. Young, slip op. at 35-36 (internal citations omitted.))

The state court concluded that a rational trier of fact could have found the essential elements of the crimes charged beyond a reasonable doubt. After careful review of the record herein, the court finds that the state court's determination of the facts was entirely reasonable, and

---

[3] The California Supreme Court denied this claim without comment or citation. (Declaration of Eric Weaver (doc. 15), Ex. II.)

that its rejection of this claim was neither contrary to nor an unreasonable application of controlling principles of federal law. For example, the record shows that approximately a week after the shooting, petitioner approached one of the passengers in the Impala and asked the passenger if he thought that petitioner had shot his friend. (RT 280-81.) Petitioner then mentioned that he had been on Mack road with two girls and had seen the shootings. (RT 280-281, 284.) Zalika Goodloe initially told police that she was with petitioner at the time of the shootings; she had run away when she heard gunshots and did not see petitioner shoot anyone. (RT 380, 695, 698-99.) Petitioner made a cryptic statement to Goodloe that if two white people asked her questions about anything, she should deny knowledge. (RT 378, 388-389.) Petitioner's delphic statement became clear to Ms. Goodloe later when two white police officers questioned her about the shootings. (RT 396.)

Erica Jones, a friend of Goodloe's, testified that Jessie Wright was a friend she had in common with petitioner. (RT 294-296.) Mr. Wright suggested that Ms. Jones and Ms. Goodloe tell the police that the three of them were with petitioner at the scene of the shootings and had headed in different directions when they heard the shot. (RT 304-306.) Jones declined to lie, and petitioner himself never asked her to lie. (RT 315.)

Mr. Wright stated that he had asked the girls to provide an alibi to petitioner as a test to determine their fondness for him, but he never expected them to speak with police. (RT at 817.) Petitioner did not ask Mr. Wright to do this. (RT 816.)

Petitioner's uncle, Robert Williams, lived in petitioner's household at the time of the shootings. (RT 489-90.) In return for information about petitioner, Williams was given leniency on an assault charge pending against him. (RT 507.) Most of Williams's testimony was rambling and unresponsive, but he acknowledged his prior statement in which he said that he had heard petitioner tell someone else on the telephone on the morning after the shootings that "I let four or five shots off at them." (RT 500.) Williams told the detective investigating the case that he was afraid of petitioner, that he was certain that he had seen petitioner with a .38 caliber

6

handgun, and that petitioner told him that he wanted to get rid of the gun. (RT 704-710.)

Nikita Christian was a jail house informant. He testified that he was in jail in late 1995 and early 1996 when he met petitioner. (RT 618-619, 624.) Both were in the same unit, but in different cells. (RT 934-935.) About three years later, Christian contacted the detective investigating the case to offer information; at the time Christian was facing charges for a violation of his probation for his February 1996 child molestation conviction. (RT 627, 653-654.) In exchange for Christian's testimony, the prosecutor agreed to seek only a jail term for the violation. (RT 653-654.) Christian testified that his testimony was the product of two brief conversations with petitioner, during which petitioner admitted that he had gotten into an altercation with rival gang members; shot at them later when he saw them in an Impala intending to hit the driver; and later learning he had "killed a youngster." (RT 623, 646.)

Petitioner made various statements to the detective investigating the case. Petitioner originally stated, in December 1994, that he was near the scene of the shootings with girls named Yolanda and Tanya. (RT at 786; II ACT 86-87, 89.[4]) Petitioner claimed that after hearing the shots, he saw the Impala with two cars following it, one of the cars was driven by "Ramon." (II ACT 87-88, 90-95, 96.) The detective was unable to locate Yolanda, Tanya, Ramon or the car. (RT at 771.) When the detective phoned petitioner to tell him this, petitioner stated that Yolanda was actually Zalika Goodloe and referred the detective to her place of employment. (RT 772-773.)

In January 1995, petitioner claimed that the driver of the other car was Michael. (RT 774, 786-787.) When petitioner was interviewed in May 1995, he claimed that he had been selling drugs near the scene of the shootings with a male companion named John or JJ. (RT 919, 926.) Petitioner also stated that a man named Cartoon was at the scene of the shooting and implied that Cartoon was the guilty party. (RT 919, 923.) Petitioner claimed that Cartoon had

---

[4] II ACT refers to the two volume set of augmented clerk's transcript containing 338 total pages.

7

confided in him and that Cartoon had made threats against petitioner's family and had physically harmed him. (RT 920.) Detectives had already determined, however, that Cartoon was at his grandmother's house in Stockton at the time of the shootings. (RT 882, 891-892.)

Although it is true that petitioner's conviction rests on circumstantial evidence, the question for a federal court reviewing a habeas application is whether a reasonable trier of fact, viewing the evidence in a light most favorable to the prosecution, could have found the essential elements of the crime beyond a reasonable doubt. See Jackson, 443 U.S. at 319. Although an appellate court may wonder whether witnesses' testimony was deserving of belief, that issue is not for an appellate court reviewing the testimony on a cold record. See United States v. Zavala-Serra, 853 F.2d 1512, 1515 (9th Cir. 1988.) Reviewing the record as whole, the court finds that a reasonable trier of fact could have found that petitioner was guilty of first-degree murder beyond a reasonable doubt. See Jackson, 443 at 319. Accordingly, the court recommends that petitioner's first claim for habeas relief be rejected.

  B.  Jury Instruction Error

Petitioner argues that his constitutional right to a fair trial was compromised by the trial court's refusal to amend CALJIC No. 3.20 as his defense counsel requested. Federal habeas courts do not grant relief, as might a state appellate court, simply because a jury instruction may have been deficient. See Estelle v. McGuire, 502 U.S. 62, 72-73 (1991). The only question for a federal court is whether the allegedly erroneous instruction by itself so infected the entire trial that the resulting conviction violates due process. See Donnelly v. DeChristoforo, 416 U.S. 637, 642-43 (1974). When a petitioner argues that a trial court failed to given an instruction, his burden is especially heavy because "[a]n omission or an incomplete instruction is less likely to be prejudicial than a misstatement of the law." See Henderson v. Kibbe, 431 U.S. 145, 155 (1977).

The trial court instructed the jury to use caution in evaluating the testimony of Nikata Christian, the jailhouse snitch pursuant to CALJIC 3.20:

> The testimony of an in-custody informant should be viewed with caution and close scrutiny. In evaluating this testimony, you should consider the extent to which it may have been influenced by the receipt of, or expectation of, any benefits from the party calling that witness. This does not mean that you may arbitrarily disregard this testimony, but you should give it the weight to which you find it to be entitled in the light of all the evidence in this case.
> "In-custody informant" means a person, other than a codefendant, percipient witness, accomplice or coconspirator whose testimony is based upon statements made by a defendant while both the defendant and the informer are held within a correctional institution.
>
> Nikita Christian is an in-custody informant.
>
> Sacramento County Jail is a correctional institution.

(CT 555). Petitioner's defense counsel sought to add this sentence to the end of the instruction:

> "[I]nformation received from sources who are themselves the focus of pending criminal charges or investigations is inherently suspect."

(CT 555.) The trial court declined to add the additional language to the instruction. (RT 1116.) The last reasoned decision on this claim was the decision of the California Court of Appeal for the Third Appellate District on petitioner's direct appeal.[5] The Court of Appeal stated:

> The defendant contends he was entitled to the addition to the instruction in order to broaden its scope to include his uncle and witness Constant, who were not in custody but where the focus of criminal investigations. In this regard the proposed addition was confusing, a proper basis for rejection, as nothing limited its application to these two witnesses. Moreover, the proposed modification is argumentative in that its flat assertion that all such witnesses are "inherently" suspect regardless of the individual circumstances, which is another basis for rejection.
> Ultimately, it is inconceivable that the defendant suffered _any_ prejudice from the omission of this instruction. It is among the class of instructions that do no more than augment the standard instructions on credibility, which in themselves are "platitudinous truisms" about commonplace matters within the comprehension of citizens of normal intelligence and which counsel are perfectly free to argue even without the aid of an instruction to that effect.

(Answer, Ex. D, People v. Young, slip op. at 35-36 (internal citations omitted)(emphasis in original.)) The Court of Appeal found that petitioner did not suffer any prejudice from the

---

[5]The California Supreme Court denied this claim without comment or citation. (Declaration of Eric Weaver (doc. 15), Ex. II.)

omission of the additional language to the jury instruction.[6] After careful review of the record herein, the court finds that the state court's determination of the facts was entirely reasonable, and that its rejection of this claim was neither contrary to nor an unreasonable application of controlling principles of federal law. As noted above, petitioner must demonstrate that the omission so infected the entire trial, that the resulting conviction violated due process. See Henderson, 431 U.S. at 154. Petitioner argues that the crux of his defense was an explanation that the witnesses against him were suspect and by omitting the proposed instruction, the court robbed him of his ability to state his defense.

The record shows, however, that petitioner was able to argue in closing argument that the witnesses against him were highly unreliable. (RT 1189, 1286-1287.) Petitioner contended that his uncle, Robert Williams was motivated to testify against him because of pending legal problems; he pointed out that another witness testified against him to provide an alibi for her boyfriend, who was also the father of her children. (RT 1247-1249.) The jury had ample evidence of the foibles of the prosecution's witnesses and was authorized to discount (or even disregard) their testimony if it was deemed appropriate.

Additionally, the court instructed the jury that they could determine the credibility of witnesses and could consider a witnesses' bias, interest, or other motive for testifying. (CT 459; RT 1132, 1134-1135.) Accordingly, the resulting conviction does not violate due process. The court recommends that petitioner's second claim for habeas relief be rejected.

    C.    Prosecutorial Misconduct

Petitioner's final claim is that the prosecutor committed prejudicial misconduct in his closing argument. Success on a claim of prosecutorial misconduct requires a showing that the

---

[6] Although petitioner contends that the Court of Appeal applied the wrong standard of review, the court does not agree. The Court of Appeal analyzed whether the omission prejudiced plaintiff, which is the same standard as that applied in a federal habeas review. See Henderson, 431 U.S. at 154 (noting that petitioner must establish that the omission of the instruction at issue so infected the entire trial that the resulting conviction violated due process).

1  conduct so infected the trial with unfairness as to make the resulting conviction a denial of due
2  process. See Greer v. Miller, 483 U.S. 756, 765 (1987).  The conduct must be examined to
3  determine "whether, considered in the context of the entire trial, that conduct appears likely to
4  have affected the jury's discharge of its duty to judge the evidence fairly." United States v.
5  Simtob, 901 F.2d 799, 806 (9th Cir. 1990).   Generally, if an error of constitutional magnitude is
6  determined, a harmless error analysis ensues.  Error is considered harmless if the court, after
7  reviewing the entire trial record, decides that the alleged error did not have a "substantial and
8  injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S.
9  619, 638 (1993).  Error is deemed harmless unless it "is of such a character that its natural effect
10 is to prejudice a litigant's substantial rights." Kotteakos v. United States, 328 U.S. 750, 760-761
11 (1946).

12             Depending on the case, a prompt and effective admonishment of counsel or
13 curative instruction from the trial judge may effectively "neutralize the damage" from the
14 prosecutor's error. See U.S. v. Weitzenhoff, 35 F.3d 1275, 1291 (9th Cir. 1993) (citing Simtob,
15 901 F.2d at  806).

16             Petitioner argues that, during his closing argument, the prosecutor misstated the
17 evidence, improperly argued that petitioner was disposed to commit the offenses, which deprived
18 petitioner of his right to confrontation and cross-examination and of his right to due process.
19 Specifically, he contends that the prosecutor employed a strategy of guilt by association,
20 suggesting intimate relations between petitioner and the prosecution's witnesses who included a
21 child molester, an admitted gang member, and a witness whose testimony suggested psychiatric
22 problems.  He further argues that the prosecutor misstated the testimony of witness Jerry
23 Constant.

24             The last reasoned decision on the claim that the prosecutor misstated evidence,
25 employing a strategy of guilt by association, was the decision of the California Court of Appeal
26

for the Third Appellate District on petitioner's direct appeal.[7]  The Court of Appeal rejected petitioner's claim, stating:

> Nothing in the prosecutor's argument relied on facts outside the record.  He merely argued that the witnesses he mentioned where no less savory than anyone else in the demimonde in which the crimes took place.  Moreover, to the extent he might have argued their testimony was contrary to that expected of those close to the defendant, this is simply an inference drawn from the fact of the existing relationship, such as it was, between the defendant and his uncle or witness Constant.

(Answer, Ex. D, People v. Young, slip op. at 35-36.)  After carefully reviewing the record, the court finds that the state court's determination of the facts was entirely reasonable, and that its rejection of this claim was neither contrary to nor an unreasonable application of controlling principles of federal law.  Given the evidence in the record, petitioner has not demonstrated that the prosecutor's closing statements "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974).  The prosecutor stated during closing, "[t]hese are the defendant's associates.  These are the defendant's family members."  (RT 1294-95.)  He also stated about the witnesses, "these are defendant's people.  These gang members, these are his people."  There was significant circumstantial evidence in the case linking petitioner to the shootings, and the prosecutor's statement did not misstate or misrepresent the evidence.  The underlying record indicates that the prosecutor's statements were a fair characterization of the witnesses' relationship to petitioner; Robert Williams was petitioner's uncle; Nikita Christian was a member of a subset of the Bloods street gang; petitioner was an admitted member of subset of the Bloods street gang.  (RT 704, 621, 663.)  The court also notes that the record does not reflect a pattern of prosecutorial misconduct.  The court recommends that this claim be denied.

Petitioner claims that the prosecutor committed misconduct by misstating the testimony of Jerry Constant.  This claim was rejected without comment by the California

---

[7] The California Supreme Court denied this claim without comment or citation. (Declaration of Eric Weaver (doc. 15), Ex. II.)

1 Supreme Court (Declaration of Eric Weaver (doc. 15), Ex. II.) Petitioner argues that because the
2 Court of Appeal and the California Supreme Court issued "post card" denials of this claim that
3 the proper standard of review for this claim is de novo as opposed to the more deferential
4 "contrary to" and "unreasonable application." The court does not agree with petitioner's
5 assertion. Where the state court fails to give any reasoning whatsoever in support of the denial of
6 a claim arising under Constitutional or federal law, the Ninth Circuit has held that this court must
7 perform an independent review of the record to ascertain whether the state court decision was
8 objectively unreasonable. See Himes, 336 F.3d at 853. In other words, the court assumes the state
9 court applied the correct law, and analyzes whether the decision of the state court was based on
10 an objectively unreasonable application of that law. Accordingly, the court will perform an
11 independent review of the record to determine whether the state court decision was objectively
12 unreasonable.

On direct examination, Jerry Constant testified that:

Q. And what, if anything, did the defendant tell you about the guns?
A. That he needed to get rid of them, and that they were hot, and that's when...
....
Q. When the defendant told you that he needed to get rid of them and they were hot, what did you take the term "hot" to mean, if anything?
A. That he used them.
A. If they were stolen, they'd have been stolen. He used the expression, "They were hot."
....
Q. Now, at any time while the defendant and RJ were in your apartment, did you ever mention anything regarding a shooting that had happened on Mack road on November 19, 1994?
A. We discussed a little bit of it, basically on the basis that he got in a shootout with some Crips. That's it.
....
Q. And when he said he was in a shootout with some Crips, was that in response to your statement about seeing a kid killed on America's Most Wanted?
A. No, I don't even think he knew at the time that it was a child. I don't think he was paying attention to the T.V.
.....
Q. Well, when did he say "We were in a shootout with some Crips"? That's my question.
A. He said it during the day. During the whole time that he came over and tried to sell me the guns, we were in the conversation about what happened.

13

        An in between that time, by the time he left, that's when he mentioned it to me.
- Q. Now, besides telling you—the defendant telling you that he was in a shootout with some Crips, did he say anything else about the incident that had occurred on Mack Road when the boy got killed?
- A. No, he mentioned that he needed to get rid of the guns quickly, and if I knew anybody that wanted to buy them, to get in touch with him.

(RT 529-531.) On cross-examination, Constant testified that:

- Q. Isn't it true that Mr. Young never told you once that he shot that boy?
- A. He never told me once that he shot that boy himself, no. He just plain stated that he got in a shootout with some Crips. Some Crips.
- Q. Do you know that it has anything at all to do with the shooting on Mack Road?
- A. No, I don't.
- Q. Do you know when that alleged shootout occurred?
- A. No, I don't, I don't know of any shootout that he's been in but this one, so no.

(RT 534-535.) During closing argument the prosecutor stated:

        But he [Jerry Constant] did indicate this, he said that he confronted the defendant about the shooting of the kid on Mack road, and that's the only shooting that he knew the defendant to be involved with.
        And at the time the defendant told him that he shot the kid on Mack Road, he attempted to sell him a weapon. Jerry Constant told you he didn't want to buy the weapon because it was hot, he felt it was hot, this is the testimony of Jerry Constant.

(RT 1189.) Clearly, the prosecutor mischaracterized and misstated Jerry Constant's testimony. After careful independent review of the record herein, however, the court finds that the state court's determination of the facts was entirely reasonable, and that its rejection of this claim was neither contrary to nor an unreasonable application of controlling principles of federal law. As discussed above, the question on review of prosecutorial misconduct claims is "whether, considered in the context of the entire trial, that conduct appears likely to have affected the jury's discharge of its duty to judge the evidence fairly." Simtob, 901 F.2d at 806. The jury was instructed that statements made to the jury during trial were not evidence. (RT 1127.) So, it is presumed that the jury understood that the prosecutor's statement was not evidence of petitioner's guilt. See Richardson v. Marsh, 481 U.S. 200, 206 (1987)(referring to the almost invariable assumption that jurors follow their instructions). Accordingly, the prosecutor did not, as

14

1  petitioner argues, provide the jury with "a key piece of evidence that did not exist." The fact that
2  the jury deliberated for twenty-seven hours spanning a period of five days lends credence to the
3  assumption that the jury did not take the prosecutor's statement as a key piece of evidence; it
4  would have made their deliberation process much easier.
5             Considering the prosecutor's misstatement in the context of the record as a whole,
6  the court cannot find that the conduct was likely to have affected the jury's discharge of its duty.
7  The prosecutor's misstated that Constant has provided direct evidence against petitioner–that
8  petitioner had told him that petitioner shot that kid, when Constant had only provided
9  circumstantial evidence about petitioner's guilt—petitioner wanted to sell a "hot" gun and began
10 talking about a shootout with some Crips when a news story about the Mack Road shooting came
11 on the television. However, it is clear that there was substantial circumstantial evidence against
12 petitioner, both from his several inconsistent statements to police and from the testimony of other
13 witnesses. The court recommends that this claim be denied.
14 ///
15 ///
16 ///
17 ///
18 ///
19 ///
20 ///
21 ///
22 ///
23 ///
24 ///
25 ///
26 ///

IV. Conclusion

In accordance with the above, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within ten days after being served with these findings and recommendations, petitioner may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Petitioner is advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:   September 7, 2006.

_____
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE